IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| W. H. WALL FAMILY HOLDINGS, LLLP, <br><br> Plaintiff, <br><br> v. <br><br> BIOTRONIK SE & CO. KG, <br><br> Defendant. | Jury Trial Demanded <br><br> Civil Action No. 6:21-cv-19 |

## COMPLAINT FOR PATENT INFRINGEMENT

Pursuant to the Federal Rules of Civil Procedure, W. H. Wall Family Holdings, LLLP ("WFH") files its Complaint for Patent Infringement against Defendant Biotronik SE & Co. KG ("Defendant"), showing this Court as follows.

### NATURE OF THE ACTION

1.      WFH is the owner by assignment of U.S. Patent No. 6,974,475 (the "'475 Patent").  [A true and correct copy of the '475 Patent is attached hereto as Exhibit 1].  The '475 Patent is a pioneering patent in the field of medical stent technology, with a priority date of December 8, 1987, and a term ending on December 12, 2022.

2.     This action arises out of Defendant's infringement of certain claims of the '475 Patent.

## THE PARTIES

3.     Plaintiff WFH is a limited liability limited partnership organized and existing under the laws of the state of Georgia.  WFH's principal place of business is in Stone Mountain, Georgia.

4.     Upon information and belief, Defendant was founded in the 1970s and through directly and/or indirectly manufactures devices for vascular intervention and electrotherapy of heart.  Upon information and belief, Defendant is based in Berlin, Germany.

## JURISDICTION AND VENUE

5.     This action arises under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c). Defendant is a foreign entity and may be sued in any judicial district under 28 U.S.C. § 1391(c)(3).

8.     Upon information and belief, Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process

91076276v.1

and/or the Texas Long Arm Statute, due at least to its substantial business in this State and judicial district, including: (A) at least part of its infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from goods sold and services provided to Texas residents.  For example, Defendant caused the BIOHELIX-I Bare Metal Stent Study, BIOFLOW-V Study, and BIOFLEX-I Study to be conducted with patients in this State

9.      This Court has personal jurisdiction over Defendant, directly or through intermediaries, including its subsidiaries, Biotronik AG, based in Bülach, Switzerland, ("AG-Sub") that manufactures and exports the Accused Products, as defined herein, into the United States and Biotronik, Inc. ("US-Sub") because Defendant has committed acts within Texas giving rise to this action and/or has established minimum contacts with Texas such that personal jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

10.     Upon information and belief, Defendant controls the subsidiaries listed above, as well as other subsidiaries. (https://www.biotronik.com/en-us/about-us/our-company/international-contacts).  And these subsidiaries give Defendant substantially the business

advantages that it would have enjoyed if it conducted its business through its own offices or paid agents in the state of Texas.

11.    This Court has personal jurisdiction over Defendant, directly or through intermediaries, including AG-Sub and/or US-Sub, because Defendant has committed acts within Texas giving rise to this action and/or has established minimum contacts with Texas such that personal jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

12.    Upon information and belief, Defendant has placed and continues to place devices infringing the '475 Patent, including the Accused Products defined herein, into the stream of commerce via an established distribution channel with the knowledge and/or intent that those products were sold and continue to be sold in the United States, including in the state of Texas and this District.

13.    Upon information and belief, Defendant has significant ties to, and presence in, the State of Texas and this District, making jurisdiction in this judicial district both proper and convenient for this action.

ATHEROSCLEROSIS AND STENT TECHNOLOGY

14.    Atherosclerosis is a buildup of cholesterol and fatty deposits, i.e., plaque, that narrows or blocks blood flow within arteries.  Coronary

artery disease ("CAD") is a form of atherosclerosis in which plaque narrows or blocks blood flow in the arteries supplying the heart.  Similarly, peripheral artery disease ("PAD") is a form of atherosclerosis in which plaque narrows or blocks blood flow in arteries not leading to heart, such as those leading to an arm or leg.

15.     These blockages, or atherosclerotic lesions, are frequently treated with percutaneous transluminal intervention (PTI).

16.     Initial PTI procedures included coronary angioplasty, first performed by Andreas Greuntzig in 1977.

17.     During an angioplasty procedure, a specially designed catheter with a tiny balloon is carefully guided through the artery to the blockage, then inflated to widen the opening and increase blood flow within the artery. Although largely effective, angioplasty occasionally resulted in a number of adverse effects, including damage to the artery or post-operative closure of the artery.

18.     Over time, doctors have recognized that these adverse effects from treating atherosclerosis with angioplasty alone may be mitigated by using stents in conjunction with angioplasty.  A stent is a wire mesh tube or "scaffold" that is permanently implanted in the artery to keep the artery open

91076276v.1

and can be combined with angioplasty to treat atherosclerosis.  The stent

helps support the inner wall of the artery following the PTI procedure.

19.    Generally speaking, there are two types of stents: (1) balloon-

expandable stents and (2) self-expandable stents.

20.    Balloon-expandable stents are biased in a collapsed position

and the surgeon uses an angioplasty balloon to expand and set the stent

within the arterial segment containing the blockage.  With balloon-

expandable stents, a balloon is inflated to compress the plaque that has built

up inside the artery against the artery's wall.  The stent, which was carried

on the deflated balloon, expands when the balloon expands, and is pushed

into place in the artery.  The balloon is then deflated and removed along with

the catheter, leaving the stent in place.

21.    Self-expandable stents are biased in an expanded position but

are constrained within a delivery mechanism until placement, when the

surgeon removes the constraining device allowing expansion of the stent.

With self-expandable stents, the surgeon may also utilize balloon

angioplasty to expand the artery prior to stent placement.

## THE '475 PATENT

22.    In 1981, while he was working as a visiting clinical professor at

Emory Dental School, Dr. Wall became acquainted with Dr. Greuntzig, who

had recently joined the Emory faculty. Dr. Wall studied the balloon angioplasty therapy pioneered by Dr. Greuntzig and concluded that arterial blockage would likely return in patients—a condition referred to as restenosis. Dr. Wall considered this issue and began working on ideas to address this problem. Initially, he tried to develop an ultrasound method to remove the blockage.

23.    After experimenting with this idea, Dr. Wall concluded that this method was not a viable solution.  On or about October 15, 1984, he conceived the invention of inserting a sleeve into an artery following an angioplasty procedure. The sleeve would then effectively hold open the artery and prevent restenosis. Dr. Wall filed a disclosure document with the USPTO in December 1984, and filed patent application no. 07/129,834 (the "'834 Application") on December 8, 1987.

24.    The '834 Application duly issued as the '475 Patent on December 13, 2005.

25.    WFH is the owner by assignment of all rights in the '475 Patent.

26.    The '475 Patent relates generally to a prosthesis that can be inserted into a bodily lumen while in a collapsed position, and then

expanded in order to prevent restenosis in the lumen. WFH has the right to enforce the '475 Patent and to recover all damages available under law.

27.     As an example, Claim 39 of the '475 Patent provides:

39.  A stent for placement into a narrowed opening of a lumen of the human body and for maintaining at least a minimum opening within the lumen, said stent comprising:

> a radially collapsible sleeve formed in a mesh and a coating applied thereto,
>
> said sleeve defining a plurality of openings throughout the mesh to allow tissue to grow therethrough, and
>
> said mesh being biased toward either its collapsed position or its expanded position.

28.     The '475 Patent, and Dr. Wall's invention described therein, have been the subject of numerous articles, including a 2006 article in the Wall Street Journal, entitled "Will Stent Makers Fight Dentist's Patent Tooth and Nail?"

29.     In 2008, Boston Scientific Corp. filed a well-publicized declaratory judgment action, seeking to invalidate the '475 Patent.

30.     Since 2008, press articles have discussed settlements of WFH's claims of infringement of the '475 Patent with a number of medical device

manufacturers such as Boston Scientific, Johnson & Johnson, and Abbott Laboratories, including WFH's settlement in 2020 with Celonova.

31.    In 2017, representatives of WFH contacted Defendant's U.S. subsidiary to discuss potential licensing of the '475 Patent. Defendant has, accordingly, had knowledge of the '475 Patent and WFH's assertions of infringement since at least this date.

32.    Among other things, Defendant designs, develops, manufactures, imports, sells and offers for sale stent products, including the Pro-Kinetic® Energy Stent System, Orsiro® Sirolimus Eluting Stent System, Astron Stent System, Astron Pulsar Stent System, and Pulsar-18 Stent System (collectively, the "Accused Products").

33.    As described more fully, below, the Accused Products comprise a stent for placement into a narrowed opening of a lumen of the human body and for maintaining at least a minimum opening within the lumen.

### DEFENDANT'S PRO-KINETIC ENERGY ACCUSED STENTS

34.    As described by the U.S. Food and Drug Administration (the "FDA") in the 2017 Pre-Market Approval for the Pro-Kinetic® Energy Stent System,

> This device is indicated for improving coronary luminal diameter in patients with de novo or restenotic lesions in native coronary arteries with a reference vessel diameter ranging from 2.25 mm to 4.0 mm and lesion length ≤ 31 mm.

9

[February 14, 2017, Pre-Market Approval for the Pro-Kinetic® Energy Stent System, a copy of which is attached hereto as Exhibit 2, at p. 1].

35.    The Pro-Kinetic® Energy Stent System:

consists of a balloon- expandable stent […] pre-mounted on a fast-exchange delivery system. The stent is intended as a permanent implant. It is made from a cobalt chromium alloy (L-605) and is coated with a thin layer of amorphous silicon carbide (proBIO).

[Biotronik AG, PRO-KINETIC ENERGY COBALT CHROMIUM (COCR) CORONARY STENT SYSTEM (IFU PK ENERGY US VERSION 15.09.2016) (the "Pro-Kinetic Energy IFUs"), p. 1, a true and correct copy of which is attached hereto as Exhibit 3].

36.    The chromium alloy stent in the Pro-Kinetic® Energy Stent System comprises a radially expandable sleeve formed in a mesh with a coating applied thereto.

37.    The chromium alloy stent in the Pro-Kinetic® Energy Stent System further comprises a sleeve defining a plurality of openings throughout the mesh to allow tissue to grow therethrough, as shown below.



38.     The Pro-Kinetic Energy IFUs further explain that a delivery catheter is used to position the chromium alloy stent in a lumen. [Ex. 3, pp. 4-5].  Once properly positioned, the chromium alloy stent is expanded through dilation of an angioplasty balloon.  [Ex. 3, p. 5].  Once fully expanded, the deployment of the stent is completed by removal of the delivery catheter.  [Ex. 3, p. 5].

39.     The chromium alloy stent in the Pro-Kinetic® Energy Stent System thus further comprises a mesh that is biased towards its closed position but expanded to its open position by an angioplasty balloon inflated by the surgeon.

### DEFENDANT'S ACCUSED ORSIRO® SIROLIMUS ELUTING STENT

40.     As described by the U.S. Food and Drug Administration (the "FDA") in the 2019 Pre-Market Approval for the Orsiro® Sirolimus Eluting Stent System,

> This device is indicated for improving coronary luminal diameter in patients, including those with diabetes mellitus, with symptomatic heart disease, stable angina, unstable angina, non-ST elevation myocardial infarction or documented silent ischemia due to atherosclerotic lesions in the native coronary arteries with a reference vessel diameter of 2.25 mm to 4.0 mm and a lesion length of ≤ 36 mm.

[February 22, 2019, Pre-Market Approval for the Orsiro Sirolimus Eluting

Coronary Stent System, a copy of which is attached hereto as Exhibit 4, at p.

1].

41.  The Orsiro Sirolimus Eluting Coronary Stent System:

is a drug- eluting balloon-expandable stent that is pre-mounted on a fast-exchange PTCA catheter delivery system with a working length of 140 cm.

…

The stent is made from a cobalt chromium alloy (L-605) and the stent geometry consists of circular end segments, a transition zone and repeating helical segments which are connected by three interconnecting longitudinal struts. The nominal strut thicknesses are 60 μm for the small stent diameters and 80 μm for the medium stent diameters.

The stent is intended as a permanent implant and is completely covered with a thin layer of amorphous silicon carbide (referred to as proBIO™ coating). The stent surface is circumferentially coated with BIOlute™, a bioabsorbable drug matrix consisting of a drug substance sirolimus and polymer poly-l-lactide (PLLA). The nominal drug content of the stent is 1.4 μg of sirolimus per mm².

[Biotronik AG, Orsiro® Sirolimus Eluting Coronary Stent System

(ORSIRO_US_IFU_Version_B.indd 1-20.08.2018 16:10:33) (the "Orsiro

IFUs"), p. 1, a true and correct copy of which is attached hereto as Exhibit

5].

42.     The chromium alloy stent in the Orsiro Sirolimus Eluting Coronary Stent System comprises a radially expandable sleeve formed in a mesh with a coating applied thereto.

43.     The chromium alloy stent in the Orsiro Sirolimus Eluting Coronary Stent System further comprises a sleeve defining a plurality of openings throughout the mesh to allow tissue to grow therethrough, as shown below.



44.     The Orsiru IFUs further explain that a delivery catheter is used to position the chromium alloy stent in a lumen. [Ex. 5, p. 7].  Once properly positioned, the chromium alloy stent is expanded through dilation of an angioplasty balloon.  [Ex. 5, p. 7].  Once fully expanded, the deployment of the stent is completed by removal of the delivery catheter.  [Ex. 5, p. 7].

45.     The chromium alloy stent in the Orsiro Sirolimus Eluting Coronary Stent System thus further comprises a mesh that is biased towards its closed position but expanded to its open position by an angioplasty balloon inflated by the surgeon.

## DEFENDANT'S ASTRON ACCUSED STENTS

46.     As described by the U.S. Food and Drug Administration (the

"FDA") in the 2015 Pre-Market Approval for the Astron Stent System,

> This device is indicated for improving luminal diameter in
> patients with iliac atherosclerotic lesions in vessel reference
> diameters between 4.3mm and 9.5mm and lesion lengths up to
> 105mm.

[December 17, 2015, Pre-Market Approval for the Astron Stent System, a

copy of which is attached hereto as Exhibit 6, at p. 1].

47.     The Astron Stent System:

> is a self-expanding stent loaded on an over-the-wire (OTW) delivery
> system. The stent (1) is laser-cut from a Nitinol tube. … and is
> completely coated with amorphous silicon carbide (a-SiC:H).

[Biotronik AG, Astron Peripheral Self-Expanding Nitinol Stent System (IFU

Astron US Version C 20.11.2015 16:01) (the "Astron IFUs"), p. 1, a true

and correct copy of which is attached hereto as Exhibit 7].

48.     The nitinol stent in the Astron Stent System comprises a

radially expandable sleeve formed in a mesh with a coating applied thereto.

49.     The nitinol stent in the Astron Stent System further comprises a

sleeve defining a plurality of openings throughout the mesh to allow tissue

to grow therethrough, as shown below.



50.    The Astron IFUs further explain that a delivery catheter is used to position the nitinol stent in a lumen. [Ex. 7, p. 3].  Once properly positioned, the nitinol stent's outer sheath is removed and the stent expands. [Ex. 7, pp. 1-3].  Once fully expanded, the deployment of the stent is completed by removal of the delivery catheter.  [Ex. 7, p. 4].

51.    The nitinol stent in the Astron Stent System thus further comprises a mesh that is biased towards its open position but constrained in a closed position by an outer sheath.

### DEFENDANT'S ASTRON PULSAR ACCUSED STENTS

52.    As described by the U.S. Food and Drug Administration (the "FDA") in the 2017 Pre-Market Approval for the Astron Pulsar Stent System, the Astron Pulsar Stent is

> indicated for use to improve luminal diameter in patients with symptomatic de novo, restenotic or occlusive lesions located in the superficial femoral or proximal popliteal arteries, with reference

91076276v.1

vessel diameters from 3.0 to 6.0mm and total lesion lengths up to 190mm.

[March 23, 2017, Pre-Market Approval for the Astron Pulsar Stent System and Pulsar-18 Stent System, a copy of which is attached hereto as Exhibit 8, at p. 1].

53.    The Astron Pulsar Stent System:

is a self-expanding stent loaded on an over-the-wire (OTW) delivery system. The stent (1) is laser-cut from a Nitinol tube. … and is completely coated with amorphous silicon carbide (a-SiC:H).

[Biotronik AG, Astron Pulsar Peripheral Self-Expanding Nitinol Stent System (IFU Astron Pulsar US rev C 14.07.2016 17:56) (the "Astron Pulsar IFUs"), p. 1, a true and correct copy of which is attached hereto as Exhibit 9].

54.    The nitinol stent in the Astron Pulsar Stent System comprises a radially expandable sleeve formed in a mesh with a coating applied thereto.

55.    The nitinol stent in the Astron Pulsar Stent System further comprises a sleeve defining a plurality of openings throughout the mesh to allow tissue to grow therethrough, as shown below.



56.    The Astron Pulsar IFUs further explain that a delivery catheter is used to position the nitinol stent in a lumen. [Ex. 9, p. 3].  Once properly positioned, the nitinol stent's outer sheath is removed and the stent expands. [Ex. 9, pp. 1-3].  Once fully expanded, the deployment of the stent is completed by removal of the delivery catheter.  [Ex. 9, p. 4].

57.    The nitinol stent in the Astron Pulsar Stent System thus further comprises a mesh that is biased towards its open position but constrained in a closed position by an outer sheath.

### DEFENDANT'S PULSAR-18 ACCUSED STENTS

58.    As described by the U.S. Food and Drug Administration (the "FDA") in the 2017 Pre-Market Approval for the Pulsar-18 Stent System, the Pulsar-18 Stent is

> indicated for use to improve luminal diameter in patients with symptomatic de novo, restenotic or occlusive lesions located in the superficial femoral or proximal popliteal arteries, with reference

vessel diameters from 3.0 to 6.0mm and total lesion lengths up to 190mm.

[Exhibit 8, at p. 1].

59.    The Pulsar-18 Stent System:

is a self-expanding stent loaded on an over-the-wire (OTW) delivery system. The stent (1) is laser-cut from a Nitinol tube. … and is completely coated with amorphous silicon carbide (a-SiC:H).

[Biotronik AG, Pulsar-18 Peripheral Self-Expanding Nitinol Stent System

(IFU Pulsar-18 US rev C 18.05.2017 11:49) (the "Pulsar-18 IFUs"), p. 1, a

true and correct copy of which is attached hereto as Exhibit 10].

60.    The nitinol stent in the Pulsar-18 Stent System comprises a

radially expandable sleeve formed in a mesh with a coating applied thereto.

61.    The nitinol stent in the Pulsar-18 Stent System further

comprises a sleeve defining a plurality of openings throughout the mesh to

allow tissue to grow therethrough, as shown below.



62.     The Pulsar-18 IFUs further explain that a delivery catheter is used to position the nitinol stent in a lumen. [Ex. 10, p. 3].  Once properly positioned, the nitinol stent's outer sheath is removed and the stent expands. [Ex. 10, pp. 1-3].  Once fully expanded, the deployment of the stent is completed by removal of the delivery catheter.  [Ex. 10, p. 4].

63.     The nitinol stent in the Pulsar-18 Stent System thus further comprises a mesh that is biased towards its open position but constrained in a closed position by an outer sheath.

64.     WFH has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '475 Patent.

65.     All other conditions precedent to the assertion of the claims herein have been satisfied or waived.


### COUNT I
### DIRECT INFRINGEMENT—'475 PATENT

66.     WFH incorporates by reference as if fully set forth herein its averments in Paragraphs 1-65, above.

67.     As set forth above, the Accused Products comprise, literally or through the doctrine of equivalents, each limitation of at least Claim 39 of the '475 Patent.

68.     Defendant has imported, sold for importation, sold and offered for sale at least one of the Accused Products within the U.S. since at least 2015, in violation of 35 U.S.C. §271, *et seq.*

69.     On information and belief, including the allegations above showing knowledge and intent, despite having knowledge of the '475 patent and knowledge that it is directly infringing one or more claims of the '475 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's infringing activities relative to the '475 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical.

70.     WFH has been, and continues to be, damaged by Defendant's infringement of the '475 Patent, in an amount not less than a reasonable royalty, together with interests and costs as fixed by this Court pursuant to 35 U.S.C. §284.

## COUNT II
### INDIRECT INFRINGEMENT—'475 PATENT

71.     WFH incorporates by reference as if fully set forth herein its averments in Paragraphs 1-65, above.

20

72.     Upon information and belief, Defendant also has indirectly infringed the '475 Patent by inducing others, including its US subsidiary and that subsidiary's customers, to infringe directly the '475 Patent.

73.     Upon information and belief, Defendant has taken affirmative actions, directly or through its U.S. subsidiary, with the specific intent to cause its wholly-owned U.S. subsidiary and its customers within the U.S. to use, offer to sell, sell or import into the United States the Accused Products in a manner that infringes at least Claim 39 of the '475 Patent.

74.     Upon information and belief, such affirmative actions included, among other things, advising or directing customers and end-users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; and/or distributing instructions that guide users to use the Accused Products in an infringing manner.

75.     Upon information and belief, Defendant has taken these steps, which constitute induced infringement, with the knowledge of the '475 Patent and that such steps induced infringement of the '475 Patent, or with willful blindness of the same.

76.     Upon information and belief, including the allegations above showing knowledge and intent, despite having knowledge of the '475 patent

and knowledge that it is indirectly infringing one or more claims of the '475 patent, Defendant has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Defendant's infringing activities relative to the '475 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical.

### INJUNCTIVE RELIEF

77.     WFH seeks preliminary and permanent injunctions as a result of Defendant's infringement of the '475 Patent. WFH is likely to succeed in showing that Defendant infringes the '475 Patent. Because of that infringement, WFH has suffered an irreparable injury, and the remedies available at law, such as monetary damages, are inadequate to compensate for that injury. For example, if WFH must enforce its judgment against Defendant in Germany, Plaintiff will face a challenging burden in persuading a German court to enforce a judgment from a U.S. court, potentially preventing WFH from obtaining any monetary damages from Defendant. Considering the balance of hardships between WFH and Defendant, a remedy in equity is warranted; and the public interest would not be disserved by a permanent or preliminary injunction.

## CONCLUSION

78.    WFH is entitled to recover from Defendant the damages sustained by WFH as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

79.    WFH has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and WFH is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

80.    WFH hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

81.    WFH respectfully requests that the Court find in its favor and against Defendant, entering a judgment in favor of WFH and granting the following relief:

a) Finding that Defendant has infringed the '475 Patent as alleged herein, directly and/or indirectly by way of inducing infringement of such patent;

b) Requiring an accounting of all damages sustained by WFH as a result of the acts of infringement by Defendant;

c) A preliminary and permanent injunction against Defendant, its subsidiaries, or anyone acting on its behalf from making, using, selling, offering to sell, or importing any products that infringe the '475 Patent and any other injunctive relief the Court deems just and equitable;

d) Awarding to WFH damages under 35 U.S.C. §284, including not less than a reasonable royalty and up to treble damages;

e) Requiring Defendant to pay WFH pre-judgment and post-judgment interest on the damages awarded;

f) Awarding to WFH the statutory costs of this action;

g) Finding this to be an exceptional case and requiring Defendant to pay to WFH its attorneys' fees and non-statutory costs incurred in this action under 35 U.S.C. §285; and

h) Awarding WFH such other and further relief as this Court deems just and appropriate, premises considered.

This 11th day of January, 2021

Respectfully submitted,

LOCKE LORD LLP

By:/s/ Bryan G. Harrison
Bryan G. Harrison
bryan.harrison@lockelord.com
TX State Bar No. 09112600
Locke Lord LLP
3333 Piedmont Rd, NE
Terminus 200, Suite 1200
Atlanta, GA 30318
(404) 870-4600—Telephone
(404) 806-5622—Facsimile

Counsel for Plaintiff W. H. Wall
Family Holdings, LLLP

91076276v.1